UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDRA LEE BRADY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 5934 |
| ) | |
| BOEHRINGER INGELHEIM ) | Judge Rebecca R. Pallmeyer |
| PHARMACEUTICALS, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Sandra Lee Brady contends that Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") discriminated against her in two instances: calculating her January 2005 pay raise and terminating her employment in July 2005. Brady alleges that this discrimination was based on her sex, age, and, in the case of her termination, disability. Brady also brings claims for failure to accommodate her disability and for retaliatory discharge under state law. Because Brady lacks sufficient evidence to support her claims, Defendant is entitled to summary judgment.

## BACKGROUND

The following facts have been taken from the parties' Local Rule 56.1 statements and responses, and are not in dispute, unless otherwise indicated. Where a party's response to a Local Rule 56.1 statement of fact does not directly contradict the fact in question and the underlying support for the fact is sound, the court deems that fact admitted.

### I. The Parties

BIPI is a specialty pharmaceutical and health care company headquartered in Ridgefield, Connecticut. (Def's 56.1 ¶ 1.) For purposes of its sales force, BIPI divides the country into regions. (*Id.* ¶ 2.) Within each region, BIPI divides its sales representatives among different districts. (*Id.* ¶ 3.) At all relevant times, BIPI employed Brady as a Professional Sales Representative ("PSR") in its Chicago North district of the Chicago region. (*Id.* ¶¶ 2-3; Pl.'s 56.1 ¶ 1.) While employed as

a PSR, Brady's sales responsibilities included increasing BIPI sales by visiting medical professionals who can prescribe BIPI products or influence potential prescribers of those products. (Def's 56.1 ¶ 4.)

## II.     Pay Raise

In January 2005, Brady and several other PSRs in the Chicago North district were eligible for and received merit-based raises. (Def.'s 56.1 ¶ 8.) At that time, District Sales Manager Kimberly Gross was Brady's direct supervisor; Gross reported to Regional Manager Bill Somers. (*Id.* ¶ 5.) Gross was the primary decision-maker responsible for calculating the amount of those raises, but she received assistance from a more experienced manager, Pam Lester, and obtained approval from Somers. (*Id.* ¶ 9.)[1] Gross attested that she based pay raise decisions on a combination of factors: 50% sales performance and 50% other factors, including teamwork, leadership, and compliance with BIPI procedures. (*Id.* ¶ 10.) Brady at one point believed that she had received a 1% merit pay raise in January 2005. (*Id.* ¶ 11; Docket Entry No. 47 (2d Am. Compl.) ¶¶ 19, 31.) The pay raise notification, on the other hand, indicates that she received a 2% merit pay increase, effective January 1, 2005. (2005 Merit Increase dated 1/20/05, Ex. F to Def.'s 56.1.) There is no dispute that a 2% merit raise was the lowest in Brady's district. (Def.'s 56.1 ¶ 11.) Of the other eligible PSRs, one woman (aged 25) received a 5% pay increase; four women (aged 36, 40, 40, and 45) received a 4% pay increase; two women (aged 24 and 35) received a 2.5% pay increase; and one man (age 49) received a 2.5% pay increase. (*Id.* ¶ 25.) At the time the pay raises were announced, Brady was 48 years old. (*Id.*)

---

[1] Gross's married name is Felten, but the court will refer to her by her maiden name throughout this opinion, to avoid confusion.

### A. BIPI's Explanation

According to Defendant, her January 2005 pay raise was the lowest in the district not because of Brady's sales performance but, rather, because of the "other factors" consideration, which raised concerns about Brady's job performance. (Def.'s 56.1 ¶ 12.)[2] In particular, Gross points to four concerns that motivated her decision to give Brady a relatively low pay raise. *Id.* ¶ 24.) According to Gross, neither the employees who are significantly younger than Brady, nor the male employee, had performance problems as significant as Brady's. (*Id.* ¶ 26.)

First, the parties agree that, in March 2004, Physicians of the North Shore Ltd. sent a letter "to request that you remove Sandra Brady as a field rep for our practice. This includes both the Skokie and Northbrook locations." (3/8/03 Letter from K. Dietrich, Ex. G to Def.'s 56.1.) The letter requested that their request be honored "immediately." (*Id.*) Brady suggests that the incident was not her fault, and does not reflect poorly on her job performance. Brady testified during her deposition that BIPI management instructed her to create a "speaker program with Rush North Shore Hospital." ( Deposition of Sandra Lee Brady dated 1/10/07 ("Brady Dep.") at 148:2-149:7, Ex. D to Def.'s 56.1.) Although her testimony does not make it clear, it appears that Brady was told to arrange for a program at which a doctor from Rush North Shore Hospital and one from Physicians of the North Shore would deliver a joint lecture. (*Id.*) Brady testified that management told her to push the idea, even when it became clear that Physicians of the North Shore was not interested in participating. (*Id.*) According to Brady, the two physicians she was instructed to incorporate into the speaker program did not get along. (*Id.*) Thus, she believes that the incident was BIPI's fault, or even designed to justify giving her a small raise. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 13-14.) Brady offers no evidence other than her own testimony to support this theory.

---

[2] In fact, Brady regularly achieved high sales performance, and BPI awarded her honors for her performance. (Pl.'s 56.1 ¶ 4.) Until March 2004, no complaint was ever made against Brady during her twelve years at BIPI. (*Id.* ¶ 5.)

3

Second, Brady continued to have unauthorized contact with Physicians of the North Shore even after BIPI manager Pam Lester told her that she should no longer work with the company. In a July 2004 memorandum, Somers reprimanded Brady for this and other improper behavior. (7/12/04 Memorandum from B. Somers to S. Brady ("Somers Memo."), Ex. H to Def.'s 56.1.) The memo states that Physicians of the North Shore practice staff "erroneously" left messages for Brady, seeking BIPI samples. (*Id.*; Def.'s 56.1 ¶ 15.) Although Lester had instructed Brady not to contact Physicians of the North Shore, Brady did write Physicians of the North Shore a letter, in which she "vehemently disput[ed]" the reasons for her removal from the account. (*Id.* ¶ 16.) According to Somers, Brady's actions angered the office manager for the Physicians of the North Shore; Brady provides no contradictory evidence. (Somers Memo.) Somers informed Brady that her actions forced him to spend time cooling the angry office manager down. (*Id.*)

A third concern Gross considered was Brady's inappropriate behavior toward her colleagues. (Def.'s 56.1 ¶ 18.) In the Somers Memo, Brady was also reprimanded for interrupting co-workers who were trying to speak at office meetings. (*Id.* ¶ 19.) Brady does not dispute that she was reprimanded for these actions, though she questions whether it influenced the decision to give her a small merit pay raise. (Pl.'s Resp. to Def.'s 56.1 ¶ 19.) Somers also reprimanded Brady for saying, at a meeting in which employees were discussing "thrush," that new hire Elizabeth Coughlin "knew all about" yeast infections. (Somers Memo.) According to Somers, he could see that Coughlin was very embarrassed by the comment. (*Id.*) Brady counters that this comment was taken out of context by other BIPI employees, in that she was commenting on Coughlin's expertise with steroid sprays and the yeast infections they cause as side effects. (Def.'s 56.1 ¶ 20.) She does not, however, deny making the comment or offer any evidence that Coughlin was not "very embarrassed" by it.

As a fourth reason Brady received a low raise, Gross notes problems with Brady's expense reports. (Def.'s 56.1 ¶ 22.) For example, Brady sought reimbursement from BIPI for the full cost

of her home high-speed Internet and cable package. (*Id.* ¶ 23.) According to Gross, this was inappropriate because cable television expenses were not reimbursable. (*Id.*) In addition, Defendant suggests that Brady charged BIPI for excessive tips and exceeded her budget for expenses. (*Id.*) Brady disputes this, claiming, based on her own deposition testimony that her previous supervisor had approved her cable television charges, and that she did not in fact incur personal charges on her corporate credit card. (Pl.'s Resp. to Def.'s 56.1 ¶ 23; Brady Dep. 194:4-23.) Brady did acknowledge, however, that Gross told her that it was not appropriate to seek reimbursement for cable television services. (*Id.*) Brady has not directly refuted the allegations that she gave excessive tips to vendors, or that the legitimate charges for which she sought reimbursement she made "far exceeded" her budget for expenses. Nor has she offered a basis to conclude that Gross's concern about these reimbursements was not genuine.

**B.     Brady's Explanation**

Arguing that sexism motivated her low pay raise, Brady points to evidence that she claims establishing an inappropriate emphasis on physical attractiveness in the BIPI office. First, Brady contends that, when Gross became District Sales Manager for the North Chicago District in 2004, expectations for female PSRs changed. (Pl.'s 56.1 ¶ 7.) She relies on her own testimony that some PSRs at BIPI dressed in "erotic" clothing, after Gross took over as the District Sales Manager. (Brady Dep. 47:10-48:19; Pl.'s 56.1 ¶ 7.) Brady testified that Gross herself wore low-cut tops to work. (*Id.* at 47:16-48:2.) Sarah Longo, according to Brady, "was wearing . . . Lycra/spandex shirts with low necklines." (*Id.*) And "Kristin [Kanter] always wear [sic] shirts that were buttoned quite low." (*Id.*) Because of this, according to Brady, the office had to change its dress code (she does not explain whether the dress code was rendered more stringent or less stringent as a result of this change, nor has either side furnished a written copy of any dress code). (Brady Dep. 47:10-15; Pl.'s 56.1 ¶ 8.) As other evidence that the BIPI sales office prioritized attractiveness, Brady points out that the PSR personnel files produced in this litigation contained photographs of the PSR, either

5

from driver's licenses or other images. (Pl.'s 56.1 ¶ 11.)[3]  Finally, Brady opined that "80 percent of the sales force looked like female cheerleaders." (Brady Dep. 66:12-14; Pl.'s 56.1 ¶ 7.)[4]  In fact, at one point, Coughlin (also a PSR) gave a presentation in a doctor's office that featured a "cheerleading routine," according to Brady. (Pl.'s 56.1 ¶ 12.) (The court is uncertain how Brady knew what happened during another PSR''s sales call.)  Thus, Brady contends that the emphasis on being a "cheerleader"-type motivated her low pay raise.

In addition, citing her own testimony, Brady contends that ageism motivated her low pay raise. Brady testified at her deposition that BIPI's policies favors employees aged 24-26 over employees over 30, and that Gross was the first in the company to start "harassing and discriminating against people over 40." (Brady Dep. 115:4-21; Pl.'s 56.1 ¶ 6.)[5]  Brady did not further explain these allegations of harassment and discrimination during her deposition or brief, other than to describe her own age discrimination claim. Based on this, Brady suggests that a reasonable jury might conclude that Gross's decision to give her the lowest pay raise in the district was discriminatory.

---

[3]  Ten of the 11 images are copies of driver's licenses. (Personnel Files Excerpts, Ex. A to Pl.'s 56.1)  BIPI points out that a PSR's job duties included driving, which is an explanation for BIPI maintaining its employees' driver's licenses in their personnel files. (Def.'s 56.1 ¶ 34.)

[4]  Brady also argues that Gross hired PSRs with "inferior academic records." (Pl.'s 56.1 ¶ 9.)  In support, she provides transcripts, with the names redacted. The court finds the basis for comparing the individuals to Brady unsatisfying, and, thus, discards this factual allegation.

[5]  Brady also claimed that Gross expected her to get out of jury duty. (Pl.'s 56.1 ¶ 13.) Brady points to an e-mail in which Gross states: "The concern is the fact that you waited until the absolute last minute to handle the situation." (E-mail from K. Gross to S. Brady of 12/28/04, Ex. C to Pl.'s 56.1.) As the court reads the exchange, Gross never encouraged Brady to duck jury duty but rather encouraged Brady to take responsibility for resolving any conflicts with her professional schedule on her own. (*Id.*) Next, Brady points out that Gross told Brady that she needed a hearing aid, which Brady characterizes as harassment. (Pl.'s 56.1 ¶ 14.)  According to Brady, Gross "harassed me even when I was on medical leave." (Brady Dep. 118:7-13.) If any of these incidents can be characterized as harassment (doubtful, in the court's view), there is no evidence that they were gender- or age-related. Thus, the court will not consider them.

**III.   Termination**

Brady fell and injured her back in an icy parking lot during work on January 6, 2005. (Def.'s 56.1 ¶ 28.) It was the next day, January 7, 2005, that Gross told Brady about the small pay raise she would be receiving. (*Id.* ¶ 27.) There is no dispute that Gross did not know about Brady's alleged fall in the parking lot when determining Brady's raise, or when communicating that raise to Brady. (*Id.* ¶ 28.) It is therefore clear that the amount of Brady's raise cannot be attributed to disability discrimination.

Within a few days of the accident, Brady took a leave of absence from work, which lasted six months. (Def.'s 56.1 ¶ 29.) Brady applied for and received short-term disability benefits from BIPI during this time. (*Id.* ¶ 30.) During her leave, Brady had medical restrictions that interfered with her ability to work, including an inability to drive, to lift more than 20 pounds, or to sit, stand, or walk for more than 20 minutes at a time. (*Id.* ¶¶ 33-34.) Brady's restrictions remained in place as of July 7, 2005, and Brady's doctors refused to provide her with a return-to-work certification at that time. (*Id.* ¶ 35.) In fact, as of her January 2007 deposition, Brady continued to abide by these medical restrictions. (*Id.* ¶ 36.)

The parties debate whether Brady was capable of performing her duties as a PSR during her six-month leave. Brady maintains that she would have been able to perform her those duties with reasonable accommodations. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 24, 31, 32, 34-36.) She testified that many of the PSRs employed by BIPI have had back pain, or have been on medication, and nevertheless been permitted to work. (Brady Dep. 183: 3-8.) But in a February 28 worker's compensation claim, Brady described her back injury as "serious and permanent" and stated that she had no identified return-to-work date. (Def.'s 56.1 ¶ 31.) Brady filed a second worker's compensation claim on June 10, 2005, this time related to "repetitive computer work and data

entry" injury to her left hand.[6] (*Id.* ¶ 32.) Brady again described her injury as "serious and permanent" and stated that her return-to-work date was unknown. (*Id.* ¶ 32.)

Six months after Brady started her leave, on July 7, 2005, Glen Englram, a Human Resources Business Partner at BIPI, informed Brady that she was "administratively terminated," meaning that she was released due to inability to work after medical leave. (Def.'s 56.1 ¶ 37.) Englram attested that he told Brady that BIPI was terminating her because her doctors had not indicated that she would be able to return to work. (Decl. of Glen Englram dated 1/9/08 ("Englram Decl.") ¶ 5, Ex. L to Def.'s 56.1.) The same day, Englram sent Brady a letter stating that she had been terminated because, after six months of leave, she had not provided a return-to-work certification from her doctors. (Def.'s 56.1 ¶ 42.) Brady admits that, in their conversation, Englram told her that her doctors had not indicated that she would be able to return to work. (Brady Dep. 173:17-24.) Brady nevertheless disputes that inability to work was the true reason for her termination. (Pl.'s Resp. to Def.'s 56.1 ¶ 37.) Instead, Brady suggests that it was motivated by her sex, age, and disability, and was a form of retaliation for the worker's compensation claims she filed. Brady recalls that Englram called her and said: "We have received a summons to appear in court in August 2005, and Bill Somers and I have decided to terminate you today, effective immediately." (*Id.*; Brady Notes, Ex. M to Def.'s 56.1.) There is no evidence in the record that BIPI actually received a summons for any court appearance, and Englram himself denies having mentioned a summons, subpoena, court appearance, or anything of the like during the conversation. (Englram Decl. ¶ 4.)

During the conversation, Brady spoke with BIPI management about the possibility that she might work as a product manager, a position that would have been a promotion for Brady. (Def.'s 56.1 ¶ 40.) This post-termination conversation was the first time Brady spoke with BIPI employees

---

[6] As Brady had been away from work for five months by then, the court is uncertain how her repetitive motion injury could have been work-related.

about potential ways to accommodate her medical restrictions, as opposed to taking medical leave. (*Id.*) Englram responded that Brady could not perform the job duties of a product manager because she was restricted from driving. (*Id.* ¶ 41.) Thus, Brady's employment was terminated as of July 7, 2005.

**IV.     Litigation**

Brady filed this litigation on October 14, 2005. (Docket Entry No. 1.) In Count I of the governing Complaint, Brady asserts that BIPI's actions in awarding her a low pay raise and terminating her employment violated the Age Discrimination in Employment Act ("ADEA"). Count II asserts that BIPI's actions also violated the Americans with Disabilities Act ("ADA"). In Count III, Brady asserts that BIPI's actions constituted sex discrimination in violation of Title VII and 42 U.S.C. § 1988. In Count IV, Brady alleges state law retaliatory discharge due to the workers' compensation claims she filed. On January 14, 2008, BIPI moved for summary judgment on each of Brady's four claims. For the reasons explained below, the court concludes that BIPI is entitled to summary judgment on Brady's three federal claims. Thus, the court declines to exercise supplemental jurisdiction over Count IV, which asserts only violations of state law.

## DISCUSSION

**I.      Standard of Review**

Summary judgment is proper when the court, having reviewed the pleadings, depositions, transcripts, discovery responses, exhibits, and affidavits, finds that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). BIPI, as the moving party, bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar*

*Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But Brady must "do more than simply show that there is some metaphysical doubt as to the material facts" to survive summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citations omitted). Likewise, Brady may not rely on mere speculation to manufacture a genuine issue of fact. *Id.* Instead, Brady must produce enough evidence to support a reasonable jury verdict in her favor. *Hicks*, 500 F.3d at 651. In other words, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer*, 518 F.3d at 484 (internal quotation marks and citations omitted).

## II. Age and Sex Discrimination

It is unlawful for an employer to discriminate against an employee with respect to compensation, terms, conditions or privileges of employment, because of the individual's age or sex. 29 U.S.C. § 623(a)(1); 42 U.S.C. § 2000e-2(a)(1). Here, Brady claims that BIPI discriminated against her on the basis of her age and sex in two instances: awarding her the lowest pay raise in the January 2005 cycle, and terminating her in July 2005.

A plaintiff may prove discrimination in violation of the ADEA or Title VII using either the "direct method" or "indirect method" of proof. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003). Plaintiff does not attempt to proceed under the direct method of proof but, rather, focuses on the indirect method, in which she can establish a *prima facie* case of discrimination by demonstrating that: "(1) she is a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). If Brady establishes a *prima facie* case, the burden of production shifts to BIPI to articulate a legitimate, nondiscriminatory reason for its decision. *Id.* If BIPI articulates such a

reason, Brady must rebut it as being mere pretext for discrimination. *Id.* At all stages, Brady bears the burden of persuasion. *Id.*

      A.      ***Prima Facie* Case**

There is no dispute that Brady is a member of a protected class or that she suffered an adverse employment action. For purposes of summary judgment, BIPI argues only that Brady's claims fail because she has not satisfied the second or fourth elements: her performance fell below BIPI's legitimate expectations, and BIPI did not treat similarly situated employees outside of Brady's protected class more favorably than they treated Brady. (Def.'s Mem. at 7.)

First, the court is skeptical that Brady's job performance met BIPI's expectations. Over the course of her long-term employment, Brady regularly achieved high sales performance, and BIPI awarded her honors for that performance. (Pl.'s 56.1 ¶ 4.) Until March 2004, no complaint was ever made against Brady during her twelve years at BIPI. (*Id.* ¶ 5.) "However, the fact that [Brady] may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of her termination." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). Beginning in 2004, Brady's job performance began to suffer. In March 2004, a BIPI customer requested that Brady be removed from their account due to her loud and obnoxious behavior with their customers and staff. (Def.'s 56.1 ¶¶ 13-14.) Despite this, she continued to contact the customer, angering the customer's office manager. (*Id.* ¶ 17.) Brady's supervisor's supervisor, Somers, was forced to intervene to calm down the office manager. (*Id.*) Even within BIPI, Brady caused tension. She was reprimanded for her behavior at internal office meetings and for embarrassing her colleagues. (*Id.* ¶¶ 18-21.) Finally, Brady had conflicts with her supervisors due to her expense reports. (*Id.* ¶¶ 22-23.) Brady's supervisor Gross (with the input of another manager and approval of Somers) explained that she made determinations about raises based on two factors: 50% sales performance and 50% other factors. (*Id.* ¶ 10.) Brady's disciplinary record in 2004 amply explains the 2% merit pay raise she received. *See Fane v. Locke Reynolds, LLP,*

11

480 F.3d 534, 540 (7th Cir. 2007) (citing *Herron v. DaimlerChrysler Corp.,* 388 F.3d 293, 300 (7th Cir. 2004) for the proposition that "plaintiff who performed some aspects of his job well, but had a confrontational and disrespectful attitude, could not show that he was meeting his employer's legitimate expectations").

For purposes of this ruling, however, the court need not decide whether Brady's performance fell below BIPI's minimum legitimate expectations. Brady's claim is doomed because she failed to identify similarly-situated individuals treated more favorably than she was. According to Brady, the similarly-situated individuals for purposes of her sex discrimination claim are those who fit BIPI's favored sex stereotypes. (Pl.'s Resp. at 9.) Although Brady does not identify these individuals with specificity, the court assumes she refers to Coughlin (who performed the cheerleading routine) as well as Kanter and Longo (who wore the low-cut outfits). For purposes of her age discrimination claim, Brady claims that employees under age 40 are the similarly-situated individuals. (*Id.*) These include Coughlin (25); Kanter (36); Longo (24); and Ramirez (35). (Def.'s 56.1 ¶ 25.) Each of these individuals received a greater than 2% merit raise in January 2005: Coughlin received a 5% pay raise; Kanter received a 4% pay raise; Longo and Ramirez each received a 2.5% pay raise. (*Id.*)

None of these individuals was similarly situated to Brady. Though Brady views her performance problems as minor, she offers no evidence that Coughlin, Kanter, Longo, and Ramirez suffered from job performance problems as significant as hers in 2004. (Def.'s 56.1 ¶ 26.)[7] To be deemed similarly situated, employees must be directly comparable in all material respects. *Brummett v. Sinclair Broad. Group, Inc.,* 414 F.3d 686, 692 (7th Cir. 2005). The Seventh Circuit

---

[7] Although Brady objects to the statement of fact as conclusory and unsupported, it is an attestation in the sworn affidavit of Gross–the decision-maker who considered each employee's records and determined the appropriate raise. (Decl. of Kimberly Felten (nee Gross) dated 1/11/08 ¶¶ 8, 24-25, Ex. A to Def.'s 56.1.) Absent contradictory evidence, the court finds Gross's sworn statements compelling.

12

has held that, "in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." *Burks v. Wis. DOT*, 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks and citations omitted). This is particularly significant here, because Gross, the decision maker, attested that Brady's job performance problems, detailed above, motivated the decision to give Brady a relatively low pay raise. (Def.'s 56.1 ¶ 24.) Thus, the fact that the younger, "cheerleader"-type employees received higher pay raises that Brady did does not provide an inference of discrimination on the basis of either age or gender.

Notably, Brady's theory ignores the evidence that three other women who received 4% raises were aged 40, 40, and 45, and were not "cheerleader" types; and that the other individual to receive a 2.5% raise was a 49-year-old man. (Def.'s 56.1 ¶ 25.) Although Brady's raise was the lowest of the group, there is no evidence that "cheerleader" types consistently received higher raises than non-"cheerleader" types. Thus, the court cannot discern a pattern of discrimination from the raises awarded in January 2005. Likewise, Brady points to no similarly-situated individual when discussing her termination in July 2005. Brady can identify no BIPI employee who was unable to work for more than six months, yet maintained on BIPI's payroll.

### B. Legitimate Reason

Even assuming Brady made a *prima facie* case of discrimination, BIPI offered a legitimate explanation, both for awarding Brady a low raise, and, later, for terminating her employment. As set forth above, concerns about Brady's job performance included that BIPI managers received complaints from customers, could not depend on her to follow explicit instructions from her supervisor regarding contact with that customer, observed altercations with colleagues, questioned her expense reports, and ultimately required intervention from her supervisor's supervisor. These factors constitute a legitimate reason for the adverse job actions.

### C. Pretext

Brady's claim would survive summary judgment, then, only if she could show that BIPI's reasons were pretextual, which "is something worse than a business error--a lie or deceit designed to cover one's tracks." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005). Thus, it is not enough for Brady to show that she was entitled to a higher raise to prove pretext; she must show that Gross and BIPI did not genuinely believe the criticisms of her performance that they cited in concluding she was entitled to just 2%. *Id.* at 436. Courts do not second-guess a company's management decisions. *Id.* "[T]he court is not a 'super-personnel department' intervening whenever an employee feels [s]he is being treated unjustly." *Id.* (citations omitted).

Brady's attempt to demonstrate pretext is based entirely on her own speculation. She suggests that the Physicians of the North Shore incident may have been a set-up, in that she was instructed to be aggressive with that customer, and that the yeast-infections comment was innocent. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 13-14, 20-21.) The implausible motion that BIPI went so far as to antagonize its own customer and employees to justify a diminished raise rests on nothing but unsupported speculation. Absent any evidence to support Brady's theory, it does not rise to the level required by *Cardoso.* As the Seventh Circuit has held, Brady's "speculation (and that is all that it is) cannot stand to demonstrate pretext." *Grube v. Lau Indus.*, 257 F.3d 723, 730 (7th Cir. 2001) (collecting cases).

To prove pretext with regard to gender discrimination, Brady also cites her own observations about the women dressing more provocatively in the office as evidence of the emphasis on appearance (and presumably youth and femininity) and BIPI. (Pl.'s 56.1 ¶¶ 7-8.)[8] Brady points to

---

[8] BIPI takes issue with the credibility of Brady's observations. Brady misjudged the ages of several co-workers including: Frances Crampton, Kanter, and Margaux Medenica as of January 2005. Brady stated of Crampton: "[o]h, Franny was really young. She was probably 22 to 24, something like that." (Brady Dep. 21:3-6.) Crampton was 40 years old. (*Id.* at 34:4-7.) Additionally, when asked about Kanter's age, Brady responded: "[o]h, real young, 24." (*Id.* at 22:2-3.) Kanter was actually 36. (*Id.* at 36:13-15.) When asked about Medenica she stated "Margaux was a bit older. Maybe thirty—maybe anywhere between 32 and 35 probably." (*Id.* at 21:22-22:1.)
(continued...)

the fact that personnel files contained photographs—evidence, Brady contends, that "BIPI PSRs were expected to reflect a certain sexualized stereotype of femininity." (Pl.'s Resp. at 11.) Underscoring this in Brady's mind is the fact that a young female PSR performed a cheerleading routine during a presentation. (Pl.'s 56.1 ¶ 12.) With regard to age discrimination, Brady asserts that BIPI's policies favors employees in their mid-twenties over employees who were at least 30-years old, and that Gross started harassing and discriminating against people over 40. (*Id.* ¶ 6.) She provides no further detail to support these assertions. Again, however, this is too speculative to satisfy Brady's burden. She has no credible evidence that BIPI lied about the basis for its employment decisions.[9] Thus, BIPI is entitled to summary judgment on these claims.

### III. Disability Discrimination

As with sex and age discrimination claims, a plaintiff seeking to recover for disability discrimination may proceed under either the "direct method" or the "indirect method" of proof. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). With respect to her disability discrimination claim, Brady again proceeds only under the indirect method.

#### A. *Prima Facie* Case

In order to establish a *prima facie* case for discrimination under the ADA, plaintiff must show: "(1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3)

---

[8] (...continued)
Medenica was 40 years old. (*Id.* at 35:15-36:9.)

[9] Brady also suggests that her superior qualifications demonstrate pretext. (Pl.'s Resp. at 13.) But the transcripts of new hires that Brady provides are redacted to remove identifying information, and she gives no explanation for how she would compare the full range of each hire's qualifications to her own. Thus, the authority on which Brady relies is inapposite. *See Ash v. Tyson Foods Inc.,* 546 U.S. 454, 457 (2006) ("qualifications evidence may suffice, at least in some circumstances, to show pretext"). Here, however, BIPI records show no basis for concluding that BIPI was biased in favor of a certain "cheerleader" personality or level of attractiveness in their hiring practices, and nothing that suggests appearance influenced the decision to award a low raise or the termination decision.

that she has suffered an adverse employment action as a result of her disability." *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005).

First Brady must prove that she suffers from a disability. A disability includes "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Brady focuses on the first of these options, arguing that she suffered from a physical impairment that substantially limited her in one of the major life activities. (Pl.'s Resp. at 15-16.) From January 2005 to at least January 2007, Brady had medical restrictions that interfered with her ability to work, including an inability to drive, to lift more than 20 pounds, or to sit, stand, or walk for more than 20 minutes at a time; she contends that these symptoms substantially limited her in the major life activity of working. (Def.'s 56.1 ¶¶ 33-36; Pl.'s Resp. at 15-16.) The court has grave concerns that Brady's injuries constitute a disability.[10]

But, in any case, Brady's disability discrimination fails because she cannot show that she was qualified to perform the essential functions of her job. The parties agree that, absent accommodation, Brady's inability to drive prevented her from performing her job duties as a PSR. (*See* Def.'s 56.1 ¶¶ 33-34.) The question, then, is whether, with reasonable accommodation, Brady could perform those job duties. The first accommodation Brady suggests could have been made was the provision of a personal assistant to act as her chauffeur. (Pl.'s Resp. to Def.'s 56.1 ¶ 41.) There is no indication that she requested this accommodation during her employment. More

---

[10] To prove substantial interference with work, Brady must show that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1017 (7th Cir. 2001) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). According to Brady, she satisfies this standard because she could not drive, and therefore was disabled with respect to the sales representative field. The "sales representative field" does not appear to constitute a "class of jobs or a broad range of jobs in various classes." BIPI does not make this argument, however, and the court need not consider it in order to decide this case.

importantly, an employer is not required to employ an assistant to perform essential job functions for a disabled individual. *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 867 (7th Cir. 2005) ("courts have been reticent, as they should be, to require employers to provide accommodations that necessitate the enlistment of another employee to assist an ADA claimant in performing the essential functions of his job"); *Sieberns v. Wal-Mart Stores*, 125 F.3d 1019, 1022 (7th Cir. 1997) (". . . to accommodate [plaintiff] they would have to hire someone else to help perform some duties. That clearly was beyond a reasonable accommodation."). Put another way, "[a]ccommodations which require special dispensations and preferential treatment are not reasonable under the ADA." *Hammel*, 407 F.3d at 867, Thus, requiring BIPI to provide Brady with a personal assistant/chauffeur would not be a reasonable accommodation to impose on the company.

As a second accommodation, Brady also suggests that BIPI could have transferred her to a position that did not require making sales calls. (Pl.'s Resp. at 17.) Brady, however, nowhere identifies what such a position might be, whether such a position was available, whether she would be otherwise qualified for the position, or whether she discussed the accommodation with BIPI. To the extent she is referring to the product manager promotion she suggested BIPI give her instead of terminating her employment, the ADA does not require employees to accommodate employees by promoting them. *Emerson v. N. States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001). In any case, Brady's driving restrictions would have prevented her from fulfilling the job duties of a product manager absent additional accommodation. (Def.'s 56.1 ¶ 41.) Brady therefore was not qualified to work as a PSR, so long as she was unable to drive.[11] For this reason, BIPI is entitled to summary judgment on her disability discrimination claim.

---

[11] Brady also suggests accommodations that could have been made to facilitate her work in spite of lifting restrictions, but the court need not address these accommodations, in light of its conclusion that Brady's driving restrictions render her unable to satisfy the *prima facie* elements of a disability discrimination claim.

### B. Legitimate, Non-Discriminatory Reason/Pretext

Even if Brady could make a *prima facie* case for disability discrimination in connection with her termination, her claims would still fail to survive summary judgment. On July 7, Brady was informed that she was being fired because she had not provided a return-to-work certification from her doctors. (Def.'s 56.1 ¶ 42.) After six months, Brady's short-term disability leave had expired. (Letter from G. Englram to S. Brady of 7/7/05, Ex. N to Def.'s 56.1.) This is a legitimate, non-discriminatory reason for terminating Brady's employment. *See Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual. . . . Inability to work for a multi-month period removes a person from the class protected by the ADA.") (internal citation and quotation marks omitted). The burden thus shifts back to Brady to prove that BIPI's reasons for terminating her were mere pretext. As discussed above, only Brady's unsupported speculation provides any indication of that the reasons BIPI gives for her termination were pretextual. BIPI is entitled to summary judgment on Brady's disability discrimination claim.

### IV. Failure to Accommodate

Brady also brings a failure to accommodate claim. "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). Beginning with the first element, the ADA defines a qualified individual with a disability to be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As explained above, Brady is not a qualified individual with a disability.

Additionally, she never adequately notified BIPI of her claimed disability. Adequate

notification requires at least that the employee inform her employer that she may have a disability that requires accommodation. *Sears, Roebuck*, 417 F.3d at 804. At the time of her termination, BIPI had no indication that Brady could return to work, with or without accommodation. Brady first requested an accommodation only after she was notified of her termination on July 7. (Def.'s 56.1 ¶ 40.) Accordingly, Brady cannot maintain a failure to accommodate claim.

## V.     Retaliatory Discharge

Finally, Brady claims that she was fired in retaliation for seeking worker's compensation, in violation of Illinois state law. Because all of Brady's claims are dropping out before trial, the court should not retain over Brady's state claim absent extraordinary circumstances. 28 U.S.C. § 1367; *Wentzka v. Gellman,* 991 F.2d 423, 425 n.1 (7th Cir. 1993). Therefore, the Illinois state law claim will be dismissed without prejudice.

## **CONCLUSION**

For the reasons explained above, Defendant Boehringer Ingelheim Pharmaceuticals, Inc.'s motion for summary judgment (107) is granted as to all counts of Plaintiff's Complaint.

ENTER:

Dated: September 26, 2008

_____
REBECCA R. PALLMEYER
United States District Judge